# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

CHRISTELLA A. ALVARADO,

        Plaintiff,


v.                                              CIV No. 01-896 BB/LFG


JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

        Defendant.


## MAGISTRATE JUDGE'S ANALYSIS AND RECOMMENDED DISPOSITION[1]

Plaintiff Christella Alvarado ("Alvarado") invokes this Court's jurisdiction under 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security ("Commissioner"). The Commissioner determined that Alvarado was not eligible for disability insurance benefits ("DIB") or supplemental security income ("SSI"). Alvarado moves this Court for an order reversing the Commissioner's final decision and remanding for a rehearing. [Doc. 9.]

Alvarado was born on April 2, 1945 and was 54 years old when the administrative hearing was held. She is married and has three children  Her statements vary as to whether she has an 11th or 12th grade education. After high school, she attended cosmetology school for about a year. Her

---

[1]Within ten (10) days after a party is served with a copy of these findings and recommendations, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such findings and recommendations. A party must file any objections with the Clerk of the U.S. District Court within the ten-day period allowed if that party wants to have appellate review of the findings and recommendations. If no objections are filed, no appellate review will be allowed.

past relevant work includes jewelry sales associate, secretary, clothing sales clerk, account representative and switch board operator. [Tr. at 104-08.] Some of the earlier records submitted to the SSA show that her last position was as a substitute secretary with an elementary school from about March 31, 1997 until June 15, 1997, and that she was not hired back because she lacked computer skills that the position required. [Tr. at 49, 90, 104.] The record also includes a letter, however, from Alvarado's physician, shortly before the October 1999 administrative hearing, commenting that Alvarado was presently working in jewelry sales at Zales and previously had worked at the health department and as a cosmetologist. [Tr. at 387.]

On May 4, 1998, Alvarado filed an application for DIB and SSI benefits, alleging an onset date of June 15, 1997. (Tr. at 79, 317.) Alvarado claims she could not work due to having insulin dependent diabetes mellitus, asthma, an inflamed liver, an enlarged heart, pericardial effusion, chronic headaches, sarcoidosis, and morbid obesity. [Tr. at 23, 65, 86.] She alleges that her impairments cause her shortness of breath, dizziness, weakness and fatigue. [Tr. at 65, 74.] At the administrative hearing, she testified that her most significant problem was "restrictive lung disease." [Tr. at 34-35.]

Alvarado's application for benefits was denied at the initial and reconsideration stages, and she sought timely review from an Administrative Law Judge ("ALJ"). An administrative hearing was held in Santa Fe, on October 8, 1999. In a decision, dated November 18, 1999, the ALJ found that Alvarado retained the capacity to perform light work activities and that "during times at issue, [she] has been able to perform her past relevant work as a jewelry store clerk." Therefore, the ALJ concluded that Alvarado was not eligible for benefits. (Tr. at 24-26.) Alvarado challenged this

determination to the Appeals Council which denied her request for review on June 26, 2001.[2]  (Tr. at 7.)  This appeal followed.

## Standards for Determining Disability

In determining disability, the Commissioner applies a five-step sequential evaluation process.[3] The burden rests upon the claimant to prove disability throughout the first four steps of this process, and if the claimant is successful in sustaining her burden at each step, the burden then shifts to the Commissioner at step five.  If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.[4]

Briefly, the steps are: at step one, claimant must prove she is not currently engaged in substantial gainful activity;[5] at step two, the claimant must prove her impairment is "severe" in that it "significantly limits [her] physical or mental ability to do basic work activities . . . .,"[6] at step three, the Commissioner must conclude the claimant is disabled if she proves that these impairments meet or are medically equivalent to one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1 (1999);[7] and, at step four, the claimant bears the burden of proving she is incapable of meeting the

---

[2]The Appeals Council considered a number of medical records and letters from Alvarado's attorney that were not before the ALJ.  (Tr. at 7.)  These documents are part of the record and are considered when evaluating whether the Commissioner's decision was supported by substantial evidence.  *See* Corber v. Massanari, 2001 WL 1203004 at *1, No. 00-3390 (10th Cir. Oct. 11, 2001) (the record to be considered on review includes all of the evidence that was before the Appeals Council, even if it was not before the ALJ); O'Dell v. Shalala, 44 F.3d 855, 859 (10th Cir. 1994).

[3]20 C.F.R. § 404.1520(a)-(f) (1999); Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988).

[4]20 C.F.R. § 404.1520(a)-(f) (1999); Sorenson v. Bowen, 888 F.2d 706, 710 (10th Cir. 1989).

[5]20 C.F.R. § 404.1520(b) (1999).

[6]20 C.F.R. § 404.1520(c) (1999).

[7]20 C.F.R. § 404.1520(d) (1999).  If a claimant's impairment meets certain criteria, that means her impairment is "severe enough to prevent [her] from doing any gainful activity."  20 C.F.R. § 416.925 (1999).

physical and mental demands of her past relevant work.[8]  If the claimant is successful at all four of the preceding steps, the burden shifts to the Commissioner to prove, at step five, that considering claimant's RFC,[9] age, education and past work experience, she is capable of performing other work.[10] If the Commissioner proves other work exists which the claimant can perform, the claimant is given the chance to prove she cannot, in fact, perform that work.[11]

### Standard of Review and Allegations of Error

On appeal, the Court considers whether the Commissioner's final decision is supported by substantial evidence, and whether the Commissioner used the correct legal standards.  Glenn v. Shalala, 21 F.3d 983, 984 (10th Cir. 1994).  To be substantial, evidence must be relevant and sufficient for a reasonable mind to accept it as adequate to support a conclusion; it must be more than a mere scintilla, but it need not be a preponderance.  Trimiar v. Sullivan, 966 F.2d 1326, 1329 (10th Cir. 1992); Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).  The Court's review of the Commissioner's determination is limited.  Hamilton v. Secretary of Health & Human Servs., 961 F.2d 1495, 1497 (10th Cir. 1992).  The Court's function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision and whether the correct legal standards were applied.  Id. at 1497-98.  In Clifton v. Chater, the Tenth Circuit described, for purposes of judicial review, what the record should show:

---

[8]20 C.F.R. § 404.1520(e) (1999).

[9]One's RFC is "what you can still do despite your limitations."  20 C.F.R. § 404.1545(a).  The Commissioner has established RFC categories based on the physical demands of various types of jobs in the national economy.  Those categories are: sedentary, light, medium, heavy and very heavy.  20 C.F.R. § 405.1567 (1999).

[10]20 C.F.R. § 404.1520(f) (1999).

[11]Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).

> The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence. Rather, in addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as the significantly probative evidence he rejects.

Clifton v. Chater, 79 F.3d 1007, 1009-1010 (10th Cir. 1996) (internal citations omitted). If supported by substantial evidence, the decision of the Commissioner is conclusive and must be affirmed. The Court cannot re-weigh the evidence or substitute its judgment for that of the Commissioner. Hargis v. Sullivan, 945 F.2d 1482, 1486 (10th Cir. 1991).

After carefully evaluating Alvarado's medical records and her testimony, the ALJ rejected Alvarado's claim for benefits at step four. [Tr. at 26.] In reaching this decision, Judge Vanderhoof's findings include the following: (1) Alvarado had not engaged in substantial gainful activity during the period in review; (2) she alleged impairments of diabetes, chronic asthma, pericardial effusion, chronic headaches, and obesity;[12] (3) the "severity of [Alvarados'] impairments" did not meet or equal any of those in the Listing of Impairments; (4) Alvarados' testimony of subjective complaints and functional limitations, including pain, were not supported by the evidence as a whole to the disabling degree alleged, and thus, lacked credibility; (5) she retained a RFC that supported light work activities; and (6) Alvarado did not meet her burden of demonstrating that she was unable to perform any category of her past relevant work. [Tr. at 23-26.] Therefore, Alvarado was not under a disability, as defined by the Social Security Act, at any time through the date of the ALJ's decision. (Tr. at 26.)

---

[12]The ALJ did not expressly state whether he found the alleged impairments to be "severe" as part of his step 2 findings, but his opinion appears to reflect that he considered them "severe," or at a minimum, considered all but the complaint of headaches to be "severe." [Tr. at 23, 25.]

In this appeal, Alvarado asserts that the case must be reversed and remanded on any of the following grounds: (1) the ALJ failed to adequately consider her combination of impairments; (2) the ALJ's RFC finding was not supported by substantial evidence, thereby rendering the finding regarding her past relevant work to be erroneous; and (3) the ALJ's credibility determination was not supported by substantial evidence and was contrary to law. [Doc. 10.] The Commissioner argues that the ALJ's decision should be affirmed because substantial evidence supports the ALJ's decision and because the decision is a correct application of the regulations. [Doc. 11.]

After a review of the entire record, this Court finds that the ALJ's decision was supported by substantial evidence, and that there is no error in that decision. Therefore, Alvarado's motion to reverse and remand will be denied.

## Summary of Alvarado's Medical Conditions

Throughout her adult life, Alvarado was a heavy smoker. She smoked a pack of cigarettes per day for about 20 years. In 1989, Alvarado quit smoking, at which point she began to gain weight from her previous weight of 130 pounds to over 220 pounds. She engages in little exercise. [Tr. at 388, 432.] She has a family history of some diabetes and hypertension. [Id.] Her numerous medical records reflect consistent recommendations by Alvarado's health care providers to attempt to reduce her weight through dieting and exercise. The records also document regular "dietary indiscretions," or failures by Alvarado to maintain a diet and to exercise. [Tr. at 431, 430, 421, 233, 154, 148, 142, 227, 225, 220, 211, 208, 202, 162, 194, 193, 192, 191, 190, 259, 258.] Many of her medical records are notable for Alvarado's resistance to her physician's instructions (e.g., to increase her diabetes medication, to maintain a proper diabetes diet, or to fill certain prescriptions, etc.), her failure to follow through with instructions from medical providers, and her missed appointments with health

care providers.  [Tr. at 431, 422, 154, 148, 149, 139, 225, 220, 211, 209, 218, 194, 316, 193, 192, 191, 258, 256, 266, 349, 350, 387, 347, 344, 336, 332.]

Alvarado relates many of her medical problems to her use of the fen phen dietary medication for about two months in 1996 [or 1994 or 1995 according to other records] [tr. at 211] and/or to the prescription she took of Glucotrol for her diabetes.[13]  She states that she is allergic to sulfa products which Glucotrol contains.  [Tr. at 266, 301, 387.]  She was angry with health care providers for prescribing this medication.

Alvarado's earliest medical records in the administrative record are from 1995, which document that she had gallstones then and that her attempts to diet were unsuccessful.  [Tr. at 160, 176, 430.]  A 1995 chest x-ray showed abnormalities in her lungs.  Sarcoidosis[14] was a consideration, along with other etiologies related to viral and/or dust exposures.  [Tr. at 157.]  On August 30, 1995, Dr. Charles Riley believed Alvarado had sarcoidosis but that it was not particularly active.  [Tr. at 176.]  He also noted that Alvarado had asthmatic bronchitis and was perhaps predisposed to getting airway inflammations.  [Tr. at 177.]  Dr. Riley was reluctant to treat the sarcoidosis without more subjective complaints and did not recommend steroid treatment because of her weight problem.  [Tr. at 178.]  Subsequent chest x-rays in late 1995 and late 1996 again showed similar abnormalities in her lungs, but with no significant changes since the earlier x-ray.  [Tr. at 156, 143.]

---

[13]Fen phen refers to the use in combination of fenfluramine and phentermine.  These prescription drugs were used as appetite suppressants in the management of obesity.  Their use, in combination with each other, has been linked to the development of valvular heart disease.

[14]Sarcoidosis is a rare disease, defined as a chronic, progressive, generalized granulomatous reticulosis of unknown etiology, involving almost any organ or tissue, including the lungs.  The acute form has an abrupt onset and high spontaneous remission rate.  The chronic form, insidious in onset, is progressive.  Dorland's Illustrated Medical Dictionary.

In about August-September 1996, Alvarado first complained of feeling dizzy, weak and drowsy. [Tr. at 233, 149.] She attributed her problems to having previously taken fen phen for a short time. [Tr. at 149.] On November 26, 1996, Dr. Rogers saw Alvarado and reported that her lab tests showed the onset of diabetes. [Tr. at 142.] He strongly encouraged an aggressive diet. In December 1996, she was prescribed Glucophage and Glucotrol for her diabetes. [Tr. at 141.]

As of February 27, 1997, Alvarado had not been taking the Glucophage for a week and her blood sugar level had increased. She was not following her diet closely nor was she exercising because of difficulties breathing. On March 20, 1997, she was taking her asthma medicine according to the prescription, was checking her blood sugars, and was following the diabetic diet. She had started to walk and was feeling better. [Tr. at 227.]

On June 5, 1997, she again was not fully following the diabetes diet and was having trouble making lifestyle changes. [Tr. at 225.] On June 15, 1997, her job with the elementary school ended, apparently because the school year ended. She was not rehired for the next year because of her lack of computer skills. June 15, 1997 is also the date of the onset of her alleged disability, although she did not claim that she had to quit working at the school because of an alleged disability. [Tr. at 73.]

Alvarado claims that she first had dizziness problems in February 1998, although the medical records document her complaints of dizziness as early as 1996. [Tr. at 123.] On April 13, 1998, Alvarado visited Dr. Karin Thron about the results of an x-ray. At that time, Alvarado had a slightly more prominent heart size. Her diabetes was under fair control, and her doctor reviewed dietary changes with her and the need for exercise. [Tr. at 213.] On April 28, 1998, Alvarado had stopped taking the antibiotics prescribed for respiratory problems because she felt nauseated. She had run out

of her inhaler medication, Proventil, and was no longer using it. She took her Fluticasone irregularly because she was afraid of its long term effects. [Tr. at 211.]

Because of her slightly enlarged heart and Alvarado's concern over her earlier use of fen phen, Dr. Thron referred her for an echocardiogram. On April 29, 1998, the echocardiogram revealed normal sizes of the left and right ventricle, but an enlarged main pulmonary artery. [Tr. at 175.] Several possible diagnoses were offered including pulmonary hypertension. The radiologist recommended considering right heart catheterization. [Id.] Dr. Thron did not feel that a catheterization was warranted because she concluded that with Alvarado's sarcoid and asthma, the most likely cause of the enlarged heart was pulmonary hypertension. [Tr. at 210.]

On May 4, 1998, Alvarado filed her application for DIB benefits. [Tr. at 79.] On June 15, 1998, Dr. Thron saw Alvarado who reported that she had resumed use of her inhalers and her breathing was improved with regular use. However, Alvarado complained of dizziness, of unknown etiology, that caused her to fall to the ground on one occasion. [Tr. at 208.] Dr. Thron spoke to Alvarado at length regarding the need for increased dietary control and exercise if Alvarado wished to stop taking the Glucotrol. [Id.] As of June 19, 1998, Alvarado stated in her disability report that she was driving and able to concentrate for extended time periods, but was dizzy and had anxiety attacks in public. [Tr. at 101-02.]

On July 9, 1998, Alvarado saw Dr. Fitzpatrick. She complained of coughing and wheezing but had not been using her Proventil inhaler for months because she was doing better. No wheezing was observed, and she was advised to resume using the inhaler. [Tr. at 218.] Dr. Thron referred Alvarado to Dr. Charles Riley, a pulmonary disease specialist, who saw her on July 10, 1998. She reported shortness of breath on minimal exertion and dizziness. She was concerned that her chest

x-ray had shown enlargement of the heart. Her oxygen levels were 90 to 91%. Dr. Riley stated her weight was not going to help and that her diabetes made the likelihood of infection higher. He recommended that she increase her use of the inhaler and that she undergo a pulmonary exercise test to determine how much was "truly lung vs. heart associated dyspnea [labored breathing]." [Tr. at 204.]

On July 29, 1998, Alvarado returned for the exercise test. Exercising was stopped because of fatigue and mild dyspnea. Her oxygen levels dropped from 91 to 87% with exercise. [Tr. at 162.] Dr. Riley stated that the crackles in her chest probably represented some sarcoidosis of the lung but that Alvarado did have a ventilatory limitation. Dr. Riley recommended bronchoscopy to identify whether sarcoid was related to her airway disease. "Her cardiac questions are of doubtful significance. . . ." Dr. Riley also suggested that a 6 week course of prednisone might be worthwhile. [Tr. at 163.]

On July 30, 1998, an RFC assessment was performed. [Tr. at 181.] The exertional limitations were occasional lifting of 20 pounds, frequent lifting of 10 pounds, and standing, walking or sitting for 6 hours. The examiner noted Alvarado's history of asthma and recommended she avoid airborne pollutants. She was given a light RFC and the examiner commented that her condition did not come close to a listing. [Tr. at 188.] On July 31, 1998, her underlying DIB application was denied. [Tr. at 61.]

On September 22, 1998, Alvarado again saw Dr. Thron for follow up on her diabetes and chronic lung problems. [Tr. at 194.] She did not wish to take antibiotics and did not want to increase her diabetes medication. [Id.]

On October 6, 1998, she filed another application for SSI. [Tr. at 317.] On October 23, 1998, she told Dr. Thron she was planning a lawsuit against phen fen. The control of her diabetes was worse, and she was encouraged to make dietary changes and to increase exercising. She declined antibiotics for her "mild bronchitis." [Tr. at 193.] On November 25, 1998, her diabetes was out of control. She had not been taking her diabetes medication for more than two weeks. She was to restart the Glucotrol, and encouraged to exercise and diet again. She had been driving for 24 hours from Mexico and was complaining of low back pain. [Tr. at 192.] As of December 7, 1998, Alvarado's diabetes was in poor control and she had "quit following program." She was to resume diet and walking program. [Tr. at 191.]

On December 7, 1998, Alvarado filled out a disability daily activities questionnaire.[15] She stated she could not drive, although this statement somewhat conflicted with her representation that she drove for 24 hours from Mexico. Alvarado complained that she became dizzy and lightheaded when in a crowd of people, and tended to lose her concentration when she was reading a book. [Tr. at 117.] She claimed to have asthma attacks twice a month, each lasting ten minutes and requiring two hours to recover. [Tr. at 121.] On December 15, 1998, her diabetes was not in good control. She knew she needed to exercise although she was not exercising. [Tr. at 190.]

On January 11, 1999, her request for reconsideration of the earlier denial of SSI benefits was denied. The Commissioner noted that while the medical evidence showed she was unable to control her diabetes, that condition was usually controlled by strict adherence to proper diet and medication. [Tr. at 68.] The decision characterized her breathing as impaired but still functional. The

---

[15]It is confusing that Alvarado states on this form that she lives alone while other medical records from this same time period, refer to her husband's blood sugar meter. [Tr. at 190.] Moreover, later records do not indicate that she was separated from her husband. A 1999 physician's letter reflects that she is married, is a housewife and has three children. [Tr. at 387.]

Commissioner concluded that while her condition might limit the type of work she could do, it should not prevent her from performing some kind of work. [Id.] She was to avoid environments that would aggravate her asthma.

In early 1999, she continued to have respiratory problems and poor control of her diabetes. She complained of shortness of breath and was afraid of going to sleep at night for fear of not waking up. She also developed a skin rash. Her oxygen saturation ranged from 85 to 90%. There was concern whether her sarcoidosis was complicating her condition. [Tr. at 258-60.] Her physician recommended that she increase her Glucotrol but she declined to do so. [Tr. at 258.] Alvarado was given a short dose of Prednisone for three days only, but she did not take it. [Tr. at 258, 257.] On February 19, 1999, the nurse practitioner discussed the possibility of hospitalization to get her diabetes under control and to have pulmonary function testing done, but she did not show up for her February 22 appointment. [Tr. at 263.]

At the administrative hearing, Alvarado testified that she was hospitalized for a week in early 1999 because she could not breathe. [Tr. at 35.] Tests results from February 24 and 25 reflect increased changes in her lungs due to an uncertain cause. [Tr. at 398.] The radiologist concluded that sarcoid was a less likely cause due to the results, and that infectious pericarditis was unlikely. [Tr. at 398.] The February 25 echocardiogram showed that Alvarado's right ventricle was significantly enlarged, the right atrium was enlarged and the left atrium was borderline enlarged. The main pulmonary artery was significantly enlarged. The physician concluded there was moderate pulmonary hypertension. The pericardial effusion was new but the pulmonary artery enlargement was chronic. [Tr. at 306-07.]

On March 2, 1999, following her hospitalization, Alvarado had a follow-up examination by Dr. Gary Giblin. Her oxygen saturation was 88 to 94% on room air. She was feeling less shortness of breath. While hospitalized, she was offered a biopsy for sarcoidosis which she refused. She also refused a bronchoscopy because "of complications she truly believes . . . [were] caused by being on Glucotrol . . . [which] caused her lungs damage." [Tr. at 255.] She further agreed to take Prednisone for sarcoidosis but she took it only one day because she did not like the way she felt. [Id.]

On March 10, 1999, Alvarado refused to increase her new diabetes medication even though her blood sugars were up. She wished to exercise and lose weight to reduce her sugars. [Id.] Dr. Giblin referred Alvarado to Dr. H. William Adkison, a cardiologist. Alvarado arrived at Dr. Adkison's office without any records and without the results of recent extensive work-up. This placed Dr. Adkison at a disadvantage because he was aware of her extensive testing during her hospitalization as she had refused consent for him to perform a transesophageal echocardiogram. [Tr. at 301.]

Dr. Adkison stated that sarcoidosis then, while entertained, had been ruled out with certainty. He commented that "she blamed all of her problems on having been given a sulfanuria agent in the past. She is very angry towards various providers . . . She is also angry that she was not given oxygen in the past . . . allowing her to develop pulmonary hypertension and enlargement of the pulmonary artery . . . ." [Tr. at 301.] She was short of breath with ordinary physical activities "which she attributes in large part to her morbid obesity." She took fen phen for three months in 1994 or 1995, which she stopped because of palpitations. Dr. Adkison observed that she was only mildly dyspneic with walking into the exam room. Moderate pericardial effusion was noted. The right ventricle and right atrium were modestly enlarged. The overall pattern did not suggest pulmonary

hypertension. Dr. Adkison's assessment was that she had "an ill-defined interstitial lung disease." She also could have hypoventilatory problems related to obesity. Dr. Adkison acknowledged that the sulfa medication she had taken could have created an allergic response and that she might be improving because she was off of it. [Tr. at 303.]

On April 12, 1999, Dr. Giblin again saw Alvarado. She was not able to control her diabetes on the new medication but refused to take Glucophage. She requested portable oxygen. She was unable to exercise due to shortness of breath. Her oxygen saturation was 90% but reduced to 79-80% with mild exertion. [Tr. at 268.] On May 24, 1999, she complained of chest tightness that she attributed to the new diabetes medicine, so she stopped taking it. She believed that her pulmonary problems were due to taking Glucotrol. She appeared willing to try Glucophage again. [Tr. at 351.]

As of July 20, 1999, she was not taking Glucophage and had not been checking her blood sugars. She was losing weight and stated she was breathing better. She requested she be placed on insulin because she believed insulin was a substance that her body naturally made and that she would not react to negatively. She was taught insulin drawing and injection. [Tr. at 350.] On August 6, she was scheduled to review insulin injection because she did not remember how to draw up insulin so she had not been taking it. She did not show up for this appointment. [Tr. at 349.]

On August 30, 1999, Dr. Bruce Shaffer, a pulmonary disease specialist, saw Alvarado. [Tr. at 387.] She told him that the onset of her shortness of breath occurred in December 1996, shortly after starting on Glucophage and Glucotrol. Dr. Shaffer noted that her problems were gradually improving after she stopped the Glucotrol. "By April she was able to do all her activities of daily living without problem, which was a major problem before." She had lost 37 pounds and was down from 232 pounds to 193. On a flat surface she could walk without dyspnea on exertion. [Tr. at 388.]

14

She was not exercising and she realized that she needed to be on a diabetic diet. Dr. Shaffer concluded that her pulmonary hypertension was secondary to Glucotrol based on her history and elimination of the medication.

Less than a month after seeing Dr. Shaffer, Alvarado filled out a medical treatment form for the SSA. She emphasized her breathing problems and that Dr. Adkison had told her that her heart was enlarged with fluid around it. She was having bad headaches and taking Tylenol extra strength for them. [Tr. at 128-29.]

At the administrative law hearing on October 8, 1999, she characterized her most significant problem to be restrictive lung disease and testified that she had to use oxygen "constantly." She was tired and exhausted if she walked too many feet. Her diabetes was "really out of control." She testified that her doctors had suggested she take insulin (contrary to the medical records that state she initiated the request). She then stated her diabetes was more under control and that she was able to control it through diet. She again testified that she lived alone, yet in August 1999 she told Dr. Shaffer that her husband had not told her she had apnea while sleeping. [Tr. at 38, 389.] She stated that she had no problems sitting for any length of time but sometimes became dizzy while standing. [Tr. at 40.] She was able to pick up 20-25 pounds. She sleeps about seven hours but uses oxygen "every single night." [Tr. at 45.] She had stopped driving a year before the hearing due to dizziness. [Tr. at 41.] She told the ALJ that the last time she worked was at the elementary school about a year and a half ago, in contrast to Dr. Shaffer's August 1999 letter indicating she was presently working at Zales. [Tr. at 47.]

The ALJ's decision denying benefits was issued November 18, 1999.

On November 22, 1999, Alvarado's oxygen saturation level was 93% but she complained of a cough for the last month. Her blood sugars, on insulin, were improved. [Tr. at 347.] She did not show up for her health education appointment on December 2, 1999. [Tr. at 347.] On December 27, 1999, she saw Dr. Giblin and told him she was upset that her disability was denied and that it was indicated she was noncompliant with her diabetes. Dr. Giblin noted that his review of her chart showed that she had been very compliant and that her problems had been more due to the Glucotrol therapy than non-compliance. [Tr. at 345.]

On January 27, 2000, Alvarado missed her health education appointment. [Tr. at 344.] On February 8, 2000, she was complaining of increasing shortness of breath, but her diabetes was under better control. [Tr. at 338.] On March 9, her saturation level was 92% with room air. [Tr. at 337.] On March 31, she no showed. [Tr. at 336.] On April 11, her oxygen saturation was 86%. She thought she was allergic to insulin because she was itching on her abdomen, so she stopped taking it. Her diabetes was under poor control. "She voices a lot of frustration that she's not able to get on Disability." [Tr. at 336.] Dr. Giblin intended to dictate a letter to her lawyers and to convince her to restart the insulin. [Id.]

On April 11, 2000, Dr. Giblin wrote a letter for Alvarado stating that he was informed Alvarado was denied disability because "it was thought she had asthma." [Tr. at 367.] Dr. Giblin clarified that she had interstitial lung disease with bronchiectasis that they thought was secondary to adverse drug reaction to a diabetic medication. He stated that this process had decreased her lung function by approximately 35% below normal and had resulted in her suffering from chronic hypoxia. He believed that it would be very difficult for her to have sustained employment. [Tr. at 367.]

On April 13, 2000, an echocardiogram was performed showing moderate pulmonary hypertension and that the right ventricle was mildly enlarged. The left and right atria were moderately enlarged. Dr. Giblin saw Alvarado on May 16. She was interested in having a lung biopsy done; she no longer was taking insulin. Dr. Giblin noted that the diabetes was very difficult to treat since she refused to take insulin. He planned to prescribe Avandia but noted its sulfur molecule. [Tr. at 332.]

The last medical record that is part of the administrative record is a February 15, 2001 echocardiogram. Dr. Adkison read it and concluded that there was worsening and "now severe pulmonary hypertension." [Tr. at 9.]

### Discussion

**A.** **_Combination of Impairments:_**

"[T]he claimant must make a threshold showing that his medically determinable impairment or combination of impairments significantly limits [her] ability to do basic work activities. . . ." Williams v. Bowen, 844 F.2d 748, 751 (10th Cir. 1988.) The mere presence of a condition or aliment, documented in the record, does not necessarily prove the plaintiff is significantly limited in the ability to perform basic work activities. _See_ Hinkle v. Apfel, 132 F.3d 1349, 1352 (10th Cir. 1997).

In determining whether an applicant is disabled for purposes of benefits, the ALJ must consider "the combined effects of impairments that may not be severe individually, but which, in combination, may constitute a severe medical disability." Hargis v. Sullivan, 945 F.2d 1482, 1491 (10th Cir. 1991) (_citing_ 42 U.S.C. § 423(d)(2)(C)(1988)); 20 C.F.R. § 404.1523. The SSA regulations provide that the combination of impairments will be considered in determining whether

a Listing is met, even if none of the separate impairments does not meet or equal a listed impairment. 20 C.F.R. § 404.1526(a); 416.926(a)(2).

Plaintiff argues that the ALJ's decision does not contain any analysis to show that a combination of Alvarado's impairments was considered. She then identifies a number of conditions, including pulmonary hypertension, interstitial lung disease, cardiac disease, diabetes, obesity, and possible obstructive sleep apnea, that when intertwined demonstrate that she allegedly is unable to work. [Doc. 10, p. 4.]

In his decision, Judge Vanderhoof stated that the severity of claimant's ***impairments*** had not met or equaled a listing, indicating that he considered her multiple conditions in reaching this decision. [Tr. at 23.] In addition, the ALJ discussed separately Alvarado's subjective complaints, including pain, her lung condition which he characterized as "debilitating asthma,"[16] her complaints of fatigue, chronic arterial hypoxemia, interstitial lung disease, obesity, headaches and dizziness. [Tr. at 24-26.] After discussing all of these conditions, the ALJ decided that she retained the RFC for light work not involving fumes, etc. [Tr. at 26.] An ALJ need not do more. *See* <u>Hamilton v. Sec'y of HHS</u>, 961 F.2d 1495, 1500 (10th Cir. 1992) (court concluded that the ALJ had considered the claimant's impairments in combination even though the judge did not precisely enunciate each decisional step).

Here, the ALJ considered all of the claimant's impairments in his evaluation of Alvarado's RFC, along with her credibility about subjective complaints, and found that she had failed to satisfy her burden to demonstrate she was unable to return to any category of her past relevant work. There

---

[16]While Alvarado was upset after being denied disability that her condition was referred to as asthma rather than interstitial lung disease, some of the disability documents she filled out refer to her condition as asthma [tr. at 86, 87, 112, 121]. Moreover, during the ALJ hearing, Alvarado stated that Dr. Riley had called her condition "restrictive lung disease," apparently meaning interstitial lung disease. [Tr. at 34.] Dr. Riley also noted that her coughing and wheezing suggested asthmatic bronchitis. [Tr. at 162, 203.]

is nothing in the record to indicate that Judge Vanderhoof failed to consider all of Alvarado's impairments in combination in reaching his decision. "To require a more elaborate articulation of the ALJ's thought processes would not be reasonable." Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992) (internal citation omitted). Therefore, the court is satisfied that the ALJ adequately considered the combined effect of Alvarado's conditions. See Mose v. Apfel, 1999 WL 1063829 at *4 (10th Cir. Nov. 23, 1999) (the fact that the ALJ discusses an applicant's problems one at a time does not mean he failed to consider them in combination.)

**B.** **_RFC and Past Relevant Work_:**

A person's residual functional capacity is defined as that which she still is able to do despite the limitations caused by her impairments. 20 C.F.R. § 1545(a). The RFC assessment is an administrative finding that is reserved solely to the ALJ and is based on a review of all of the evidence. 20 C.F.R. § 1546. Claimant bears the burden of proving her inability to return to a particular prior job. Andrade v. Sec'y of HHS, 985 F.2d 1045, 1050 (10th Cir. 1993). Here, at step four of the sequential analysis, Judge Vanderhoof discussed Alvarado's testimony describing her previous relevant work as light in nature and determined that she retained a RFC that supported light work activities.[17] [Tr. at 24.] Significantly, he also noted that during the time at issue (i.e., several months before the ALJ hearing), Alvarado was working as a jewelry store clerk and performing the duties of that position. [Tr. at 26.]

---

[17]The SSA defines work as "light" when it "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all these activities." 20 C.F.R. § 404.1567(b).

Alvarado claims that there were at least three errors with respect to the RFC finding: (1) the ALJ relied on a non-examining doctor's opinion from Disability Determination Services for the conclusion that she could perform light work not involving fumes or other irritants; (2) there is contrary medical evidence post-dating the non-examining physician's review; and (3) the record is replete with evidence of nonexertional impairments, including fatigue, dizziness and shortness of breath. [Doc. 10, at 7-8.] The Court rejects Alvarado's argument and finds substantial evidence supporting the ALJ's RFC finding and determination that she could perform her past relevant work.

### 1. Non-treating doctor's opinion:

"The general rule is that 'the written reports of medical advisors who have not personally examined the claimant 'deserve little weight in the overall evaluation of disability. The advisers' assessment of what other doctors find is hardly a basis for competent evaluation without a personal examination of the claimant.'" Allison v. Heckler, 711 F.2d 145, 147-48 (10th Cir. 1983) (internal citations omitted). A treating physician's opinion, that is supported by medical evidence and not unacceptably brief or conclusory, is entitled to more weight than the opinion of a physician who has reviewed the medical evidence but not examined the claimant. Id. at 148 (internal citation omitted); Broadbent v. Harris, 698 F.2d 407, 412 (10th Cir. 1983); 20 C.F.R. § 416.927(d)(1).

Notwithstanding the general rule that opinions of non-examining or non-treating physicians are given less weight than those of examining physicians, opinions of medical advisors are entitled to some weight. Talbot v. Heckler, 814 F.2d 1456, 1463 (10th Cir. 1987); Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995). *See also* SSR 96-6p (findings of fact made by State agency program physicians regarding the nature and severity of an individual's impairments are treated as expert opinion evidence and cannot be ignored by the ALJ).

Here, the ALJ stated that his RFC assessment was supported by the opinion of the non-treating medical consultant and was not inconsistent with the opinion of Alvarado's treating physicians or the evidence. On July 30, 1998, Dr. Donald Stewart, non-examining agency physician considered Alvarado's records of diabetes, asthma ("restrictive disease"), liver disease, heart problems and possible sarcoidosis. He concluded that a light RFC was appropriate, but that Alvarado should avoid exposure to airborne pollutants. [Tr. at 185.] She could lift 20 pounds occasionally, 10 pounds frequently, stand, sit or walk for 6 of 8 hours and had unlimited ability to push or pull. [Tr. at 182.] Some of Alvarado's own testimony at the ALJ hearing is consistent with Dr. Stewart's conclusion. She testified that she could lift 20-25 pounds, or perhaps her coffee table, she had no problems sitting for any length of time, and she could push a grocery cart, etc. At the time of Dr. Stewart's review, none of Alvarado's treating physicians had indicated that she was restricted from any type of work. Moreover, as of the date of the ALJ hearing and decision, there were no medical records before Judge Vanderhoof showing that Alvarado's physicians had concluded she was unable to work.

The medical records that were before the reviewing physician and Judge Vanderhoof, while extensive, did not translate into any specific functional deficits that precluded work activity for Alvarado. Moreover, many of the medical records were inconclusive as to the source(s) or extent of Alvarado's problems. For example, the doctors were not certain what was causing her lung problems or her "ill-defined" interstitial lung disease. Alvarado herself consistently determined that she was allergic to medications (fen phen, diuretics, Glucotrol, Glucophage, other Diabetes medications and Insulin) and unilaterally stopped taking all of those medications, but her doctors never specifically concluded she was allergic. Instead, they speculated that some of her problems

might have been related to the Glucotrol based on her complaints and cessation of that medicine. Here, the medical records and evidence before the ALJ provide little if any evidence that Alvarado was unable to return to her past relevant work or perform light level work.

The medical records obtained subsequent to the agency physician's review, e.g., March 19, 1999 letter from Dr. Adkison, show that her interstitial lung disease was "ill-defined," her hypoventilatory problems might be related to her obesity, no certain cause for her pericardial effusion but that it had no "hemodynamic importance" then, and that Alvarado admitted that her shortness of breath with physical activities could be attributed "in large part to her morbid obesity." [Tr. at 301.] This report, although identified by Alvarado's counsel, does not conflict with Dr. Stewart's RFC evaluation.

Furthermore, the most recent medical records before the ALJ showed that Alvarado's symptoms were gradually improving. [Tr. at 388.] Her most current echocardiogram as read by Dr. Shaffer "showed there was no longer the moderate pulmonary hypertension and that the pericardial effusion was much smaller." [Id.] Dr. Shaffer commented that by April 1999, she "was able to do all her activities of daily living without problem . . . ." [Id.] On a flat surface, "she was able to walk without dyspnea on exertion at all." [Id.] "[A]ll of the symptoms she's had have either resolved or improved on their own." [Id.] At the ALJ hearing in October, she testified that by taking her insulin, her diabetes was "more in control." [Tr. at 55.]

Finally, Judge Vanderhoof noted that Alvarado was able to perform her past work as a jewelry sales associate during the pertinent time frame. [Tr. at 26.] This is evidenced by Dr. Shaffer's letter, after he met and examined Alvarado. [Tr. at 387.] Dr. Shaffer commented that, as of August 30, 1999 before the October ALJ hearing, Alvarado was currently working at Zales. In Plaintiff's reply

brief, counsel notably makes no response regarding her employment. Assuming this information is accurate, it demonstrates that Plaintiff was able to perform the duties of her prior relevant work during the pertinent time frame. *See* <u>Stevenson v. Chater</u>, 105 F.3d 1151, 1154 (7th Cir. 1997) (evidence that claimant worked after the alleged onset of disability supports a finding of non-disability).

The ALJ did not rely solely on the non-examining physician's opinion as to Alvarado's condition and limitations in reaching his decision. The Court is satisfied that substantial evidence, including Dr. Stewart's opinion, supported the ALJ's findings.

## 2. <u>New Medical Evidence</u>:

Subsequent to Dr. Stewart's RFC assessment and the ALJ's decision, Alvarado's treating physician, Dr. Gary Giblin, wrote a letter on her behalf and Alvarado had other medical testing done. This new evidence, while not before Judge Vanderhoof, was presented to the Appeals Council. Thus, it must be considered in determining whether the ALJ's decision is supported by substantial evidence. <u>Richmond v. Shalala</u>, 23 F.3d 1441, 1444 (8th Cir. 1994).

The new evidence identified by Alvarado includes the following: December 27, 1999 medical record by Dr. Giblin commenting that Alvarado was very upset about the disability decision and the agency's comments that she was noncompliant with her diabetes [tr. at 345]; February 6, 2000 chest films showed "severe lung interstitial changes" but that the overall appearance was stable and unchanged since 2/24/99 testing [tr. at 341]; February 8, 2000 medical record showing normal oxygen saturation [tr. at 338]; March 9, 2000 medical record showing 92% oxygen saturation and unknown causation for chronic interstitial lung disease [tr. at 337]; April 13, 2000 echocardiogram showing mild enlargement of right ventricle, moderate enlargement of left and right atria, and

moderate pulmonary hypertension [tr. at 10]; April 11, 2000 medical record showing that she had

chronic interstitial lung disease that was "stable" [tr. at 336]; May 16, 2000 medical record showing

she stopped the insulin because she believed she was allergic and a lower oxygen saturation of 83-

84% [tr. at 332]; February 15, 2001 echocardiogram showing "abnormal study, with worsening and

now severe pulmonary hypertension" [tr. at 9.].

      In addition, the ALJ did not see Dr. Giblin's April 11, 2000 letter, that seemed to be prompted

by Alvarado voicing a lot of frustration to him that she was unable to get on disability. [Tr. at 336].

Dr. Giblin's single paragraph letter states that he wished to clarify that Alvarado had interstitial lung

disease, that "we think is probably secondary to adverse drug reaction to a diabetic medication" and

that it decreased her lung function by about 35%. He also stated he thought it would be very difficult

for her to have sustained employment. [Tr. at 367.]

      None of these recent medical records provide evidence that an error was made in denying

Alvarado benefits. Many of them indicate minimal or moderate problems, a stable condition

(although often with unknown etiology), and adequate oxygen saturation levels. None of the records

(with the exception of Dr. Giblin's letter) state that she is unable to work or that she has work-related

limitations. The most recent echocardiogram in February 2001 apparently shows a worsening

condition as of that date, but it is no indication that she suffered from severe pulmonary hypertension

during the period under review. *See* <u>Boone v. Apfel</u>, 1999 WL 668253 at *2 (10th Cir. Aug. 26,

1999) (Appeals Council will consider "new evidence," if it is material (reasonable possibility that it

would have changed the outcome) and if it relates to the time period for which the benefits were

denied).

Finally, Dr. Giblin's short conclusory letter does not convince the Court that the denial of benefits was in error or unsupported by substantial evidence. It is true that Dr. Giblin was Alvarado's treating physician and that he treated Alvarado on many occasions. However, his letter is simply unbelievable in view of the objective medical evidence. For example, his letter states that Alvarado was compliant with her diabetes, but numerous records are to the contrary. Dr. Shaffer's letter to Dr. Giblin stated that she was not on the diabetic diet. [Tr. at 348] Medical records on August 6, 1999, when she was seeing Dr. Giblin, show that she had not been taking insulin after she requested it. [Tr. at 349.] Dr. Giblin noted that she was not taking Glucophage and not checking her sugars. [Tr. at 349.] A number of other medical records in this time period indicate that she did not show up for appointments. She repeatedly failed to follow the diabetes diet and to exercise. In addition, she consistently elected to take herself off diabetes medication, and while perhaps she was allergic to Glucotrol, not a single physician concluded that she was allergic to all of the other medicines that she stopped taking for her diabetes.

Dr. Giblin also wrote that her lung disease reduced her lung capacity by 35%, but the Court does not locate any corroborating medical evidence to support the finding of 35% and does not know how Dr. Giblin arrived at this figure. Moreover, Dr. Giblin concluded, without providing any detail, that Alvarado's condition would make it difficult for her to sustain employment. Dr. Giblin's conclusory statements do not refer to light level employment or specific job requirements. He does not state, for example, that she is unable to sit for a certain period of time or cannot stand without dizziness. A treating physician's opinion is not dispositive on the ultimate issue of disability. Castellano v. Sec'y of HHS, 26 F.3d 1027, 1029 (10th Cir. 1994). The Court concludes that Dr.

Giblin's letter should be discounted in the basis of other objective medical evidence and because it is not well supported.

### 3. Nonexertional Impairments

Alvarado also claims that the ALJ erred because he did not consider the many nonexertional impairments discussed in the record, including dizziness, fatigue and shortness of breath. The ALJ's decision addressed Alvarado's complaints of asthma with dyspnea, breathing problems, fatigue and dizziness. He found no evidence showing that these conditions were persistent to the degree that they interfered with her ability to work light duty. The fact is she apparently was working at the time of or shortly before the ALJ hearing even though she did not admit it at the hearing.

Moreover, the medical evidence of these impairments varies day-to-day, often depending on whether Alvarado was compliant with treatment. Sometimes Alvarado's shortness of breath was improved, depending on when she used her inhaler or stopped certain medications. [Tr. at 137, 220, 227.] In May 1998, when she used her inhalers, her breathing improved significantly. [Tr. at 208.] Her complaints of dizziness also fluctuate. In 1996, she complained of being weak and dizzy but attributed these problems to her use of diuretics. When she took herself off them, she felt better. [Tr. at 149.] In February 1998, she complained of dizziness and felt the doctor believed it was because not enough oxygen was getting to her lungs, but she was not using her inhalers. [Tr. at 123, 125, 216.] She felt dizzy when she worked as a substitute secretary at the elementary school but she did not claim that the dizziness prevented her from working. Instead, she said that she was not hired due to her lack of computer experience. With respect to her complaints of shortness of breath, more often than not, the medical records show that her oxygen levels were adequate, if not normal. The Court rejects this argument as well and finds that substantial evidence supports the ALJ's findings.

## C. *Credibility Analysis:*

"Credibility determinations are peculiarly the province of the finder of fact, and we will not upset such determinations when supported by substantial evidence." Kepler v. Chater, 68 F.3d 387, 391 (10th Cir. 1995) (internal citation omitted). Nonetheless, credibility findings must be closely and affirmatively linked to substantial evidence and not merely conclusory. Id. A formalistic factor-by-factor recitation of the evidence is unnecessary. As long as the ALJ provides specific evidence upon which he relies to support his credibility findings, he complies with the dictates of Kepler. Qualls v. Apfel, 206 F.3d 1368, 1372 (10th Cir. 2000).

Here, Judge Vanderhoof acknowledged Alvarado's subjective complaints and functional limitations, including pain, and found they were not supported by the evidence as a whole or to the disabling degree alleged. The ALJ thoroughly discussed Alvarado's many decisions not to comply with prescribed medications for her breathing condition or her diabetes. [Tr. at 24.] The failure to follow a prescribed course of treatment, without good reason, is grounds for denial of disability benefits and can be the basis for discrediting claimant's subjective complaints. *See* Diaz v. Secretary of Health & Human Servs., 898 F.2d 774, 777 (10th Cir.1990); 20 C.F.R. 404.1530(b). Alvarado repeatedly failed to follow treatments prescribed or recommended by her physicians. While she alleges that she had good reason to stop the medications due to allergies and other reasons, no doctor ever confirmed these reasons other than to surmise that perhaps she had an allergic reaction to Glucotrol. Indeed, at least one physician noted how difficult it was to treat Alvarado's diabetes since she had stopped the insulin (in addition to every other diabetes medication prescribed).

Judge Vanderhoof discussed a number of other reasons to discount Alvarado's credibility, all of which were supported by the record. [Tr. at 24.] This Court concludes that the ALJ's credibility

determinations are amply supported by substantial evidence. Plaintiff's argument is without merit and is, therefore, rejected.

## **Recommended Disposition**

That Alvarado's Motion to Reverse and Remand for a Rehearing [Doc. 9] be denied for the reasons stated herein and that the case be dismissed, with prejudice.


Lorenzo F. Garcia
United States Magistrate Judge